Jack DEKRO, et al., Plaintiffs,

v.

STERN BROTHERS & CO., Defendant.

No. 77–0581–CV–W–8.

United States District Court,
W. D. Missouri, W. D.

May 14, 1982.

Phil M. Cartmell, Jr. of Gage & Tucker, Kansas City, Mo., for plaintiffs.

Robert L. Driscoll of Stinson, Mag & Fizzell, Kansas City, Mo., for defendant.

## MEMORANDUM AND ORDER

STEVENS, District Judge.

This securities fraud action arose out of the sale of tax-exempt bonds issued by three Colorado water and sanitation districts: Woodmoor at Breckenridge Water and Sanitation District (hereinafter Woodmoor at Breckenridge), Roxborough Park Metropolitan District (hereinafter Roxborough Park), and Morrison Creek Metropolitan Water and Sanitation District (hereinafter Morrison Creek). Defendant underwrote and resold the bonds. When this action was filed on August 3, 1977, all three districts were in default on their interest payments to purchasers of the bonds. Plaintiffs allege violations of federal securities laws as well as common law fraud. They contend defendant failed to disclose material facts about the Woodmoor Corporation (hereinafter Woodmoor), which was the developer of real estate projects within the districts. Woodmoor subsequently went bankrupt, leaving the projects incomplete. Revenues from water and sanitation service in the projects were lower than anticipated, and the districts eventually defaulted on their obligations.

By orders filed October 29 and November 27, 1979, Judge William R. Collinson of this court conditionally certified five separate classes of plaintiffs, comprised of the original purchasers of the five following bond issues:

1. Woodmoor at Breckenridge—August 1, 1971;

2. Roxborough Park—May 1, 1972;

3. Roxborough Park—May 1, 1973;

4. Morrison Creek—November 1, 1972;

5. Morrison Creek—April 1, 1973.

Excluded from the classes were defendant and individuals and entities connected with defendant or Woodmoor.

Following the completion of discovery on the merits, defendant filed two motions which were pending when the case was transferred to this division. Defendant first moved to decertify the five classes, arguing essentially that discovery has revealed that as to each class common questions do not predominate over individual issues. Fed.R.Civ.P. 23(b)(3). Defendant has also moved for summary judgment against three named plaintiffs. Both motions have been ably and amply briefed although the sheer volume of the suggestions has caused considerable delay in disposing of these motions.[1] The issues raised by the summary judgment motion are also pertinent to decertification; therefore, the court will attempt to streamline the discussion by resolving the motion for summary judgment before turning to the motion for decertification.

### I. MOTION FOR SUMMARY JUDGMENT

Defendant has moved for summary judgment against plaintiffs Jack Dekro, Joseph Borenstine and the Estate of Marcel Mooney. The crux of defendant's motion is that these three plaintiffs never received the bond offering circulars. According to defendant, plaintiffs' Rule 10b–5 claims thus fail for lack of reliance.[2]

On the other hand, plaintiffs contend causation can be established under either of two theories. First, even if the specified plaintiffs did not receive the offering circu-

---

1. "In the future the parties should be mindful that like the squid they face the danger of being lost in their own ink." *Osterneck v. E. T. Barwick Industries Inc.*, 79 F.R.D. 47, 55 (N.D. Ga.1978).

2. It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

    (a) To employ any device, scheme, or artifice to defraud,

    (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

    (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1981).

lars, they received from defendant oral "sales pitches" based on the offering circulars. Although the written circulars and oral presentations may have differed in some particulars, they were identical in one crucial respect: both failed to disclose material facts about Woodmoor's financial condition. As a case involving primarily omissions of material fact, reliance may therefore be presumed under *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972).

Under plaintiffs' second theory, if a bond issue is so thoroughly tainted by fraud that it owes its very existence to the fraud, then a sufficient causal link between defendant's conduct and plaintiffs' injuries is established by the mere presence of the bonds in the marketplace. Under this "fraud on the market" theory, plaintiffs would have been unable to purchase the bonds were it not for the fraudulent scheme of defendant.

The arguments of the parties focus primarily upon two cases: *Vervaecke v. Chiles, Heider & Co.*, 578 F.2d 713 (8th Cir. 1979), and *Shores v. Sklar*, 647 F.2d 462 (5th Cir. 1981), *petition for cert. filed*, 50 U.S.L.W. 3377 (U.S. Nov. 2, 1981) (No. 81–839). A discussion of each is in order.

In *Vervaecke*, the Eighth Circuit affirmed a summary judgment entered against the plaintiff in a Rule 10b–5 action because his complaint, deposition and affidavit failed to establish the element of causation in fact. Vervaecke had purchased bonds issued by a hospital authority without first reading the offering statement. "Vervaecke's chief complaint concerned alleged material misrepresentations, and omissions in the nature of misrepresentations, in two specific documents, the 1973 and 1976 offering statements which accompanied the respective bond offerings." 578 F.2d at 717. Thus, "it is not appropriate to apply the *Affiliated Ute* test to this case involving primarily *misrepresentation* under the second subparagraph of Rule 10b–5." *Id.* Without benefit of the *Affiliated Ute* presumption of reliance, Vervaecke was "obligated to state facts sufficient to raise a genuine factual dispute with regard to his

actual reliance on the misleading documents." *Id.* at 718. The district court had found that

> [P]laintiff did not even see the offering statements until after the commitment to purchase the securities had been made. Clearly, plaintiff's determination was influenced primarily by factors personal to him and unrelated to the alleged misrepresentations and omissions.

*Id.* at 719. The court of appeals then stated:

> We agree with this conclusion of the district court, but express no opinion as to which factors did induce Vervaecke to buy; we find, however, that causation in fact between the fraud complained of and Vervaecke's loss lacks support, and affirm the summary judgment granted below.

*Id.*

In *Shores*, "[b]ased on [the plaintiff's] statement in his answers to interrogatories that he never saw nor was he aware of the Offering Circular when he decided to purchase the Bonds, the district court concluded that [he] had in no way relied on the Circular's alleged misrepresentations or omissions and that his lack of reliance was fatal to his claim." 647 F.2d at 464. The Fifth Circuit en banc vacated the dismissal. According to plaintiff's allegations in *Shores*, defendants had fraudulently induced the issuance and sale of industrial revenue bonds to finance construction of a plant for the manufacture of mobile homes. As part of the scheme, defendants drafted an offering circular which included intentional or reckless omissions and misrepresentations of material facts. "The lessee of the industrial business premises, the sole source of the income necessary to amortize the revenue Bonds, almost immediately defaulted in the payment of rent, causing the value of the Bonds to drop precipitously." *Id.* at 463–64 (footnote omitted). "[Plaintiff] never saw the Offering Circular nor knew one existed. He bought the Bonds based solely on his broker's oral representations." *Id.* at 467. For this reason the Fifth Circuit agreed that "[t]o the extent

that [plaintiff] pleaded the usual 10b–5 misrepresentation or omission case, the district court was correct" in dismissing the complaint. *Id.* at 468. Plaintiff had failed to demonstrate reliance, and even if the *Affiliated Ute* presumption applied, his failure to read or otherwise rely upon the offering circular rebutted the presumption. *Id.*

The district court erred, however, in construing the remainder of [plaintiff's] complaint as narrowly confined to charges of misrepresentations and omissions in the Offering Circular that would have defrauded investors who did rely. It would permit proof that the defendants engaged in an elaborate scheme to create a bond issue that would appear genuine but was so lacking in basic requirements that the Bonds would never have been approved by the Board nor presented by the underwriters had any one of the participants in the scheme not acted with intent to defraud or in reckless disregard of whether the other defendants were perpetrating a fraud. Rather than containing the entire fraud, the Offering Circular was assertedly only one step in the course of an elaborate scheme.

*Id.* The court found plaintiff's claim cognizable under the first and third subsections of Rule 10b–5. To satisfy his burden of proof, plaintiff would have to show that

(1) the defendants knowingly conspired to bring securities onto the market which were not entitled to be marketed, intending to defraud purchasers, (2) [plaintiff] reasonably relied on the Bonds' availability on the market as an indication of their apparent genuineness, and (3) as a result of the scheme to defraud, he suffered a loss.

*Id.* at 469–70 (footnote omitted).

■■■ A careful review of *Vervaecke* and *Shores* has convinced this court that defendant's motion for summary judgment should be denied. Under the circumstances here presented, receipt of a written offering circular prior to purchase is not the litmus test of causation. Although "some causal nexus" between defendant's conduct and plaintiffs' losses is essential, proof of causation need not be limited to an affirmative showing of reliance upon a written offering circular. *St. Louis Union Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 562 F.2d 1040, 1048 (8th Cir. 1977), *cert. denied*, 435 U.S. 925, 98 S.Ct. 1490, 55 L.Ed.2d 519 (1978). At least two alternative theories of causation are available, and in the opinion of this court, either one offers a sufficient reason to deny summary judgment.

## A. *Affiliated Ute*

■■■ Despite defendant's assertions to the contrary, a review of plaintiffs' First Amended Complaint, taken as a whole, reveals that this is a case involving primarily a failure to disclose material facts about the financial condition of Woodmoor.[3] As such,

positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision.... This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact.

*Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972). Once plaintiffs show the materiality of the omitted facts, defendant has an opportunity to rebut the presumption of reliance.

"If defendant is able to demonstrate that there was clearly no reliance, that is, that even if the material facts had been disclosed, plaintiff's decision as to the transaction would not have been different from what it was, then the non-disclosure cannot be said to have caused the subsequent loss and under the ordinary princi-

---

**3.** The presence in the offering circulars of some references to Woodmoor is insufficient to make this a case of misrepresentation. It would defeat the flexible, remedial purposes of the federal securities laws to deny plaintiffs the use of the *Affiliated Ute* presumption when they allege wholly inadequate disclosure of information regarding Woodmoor. *See Affiliated Ute*, 406 U.S. at 151, 92 S.Ct. at 1471.

ples of the law of fraud, recovery should be denied. However, in light of the Supreme Court's holding in *Affiliated Ute*, the burden of proof rests squarely upon the defendant to establish the 'non-reliance' of plaintiff."

*St. Louis Union Trust*, 562 F.2d at 1049 (quoting *Rochez Brothers, Inc. v. Rhoades*, 491 F.2d 402, 410 (3d Cir. 1974)). *St. Louis Union Trust* illustrates a situation where the *Affiliated Ute* presumption was rebutted: causation was lacking because plaintiffs were legally obligated to sell their stock under a valid buy-back option unrelated to any fraud alleged. Since plaintiffs had no choice regardless of any disclosure of material facts, "causation in fact [did] not exist as a matter of law." 562 F.2d at 1049. In the instant case, plaintiffs were under no preexisting legal duty to purchase the bonds, so *St. Louis Union Trust* is distinguishable on its facts.

Defendant instead relies heavily on *Vervaecke*, where the reasoning of *St. Louis Union Trust* was applied to dismiss the 10b–5 claim of a plaintiff who had not read the offering circular prior to purchase. Despite some factual similarity to the case at hand, *Vervaecke* offers little comfort to defendant for several reasons.

First, *Vervaecke* had pleaded a typical 10b–5 case of misrepresentation, even "[t]hough other theories of this case might have been devised"; therefore, the *Affiliated Ute* presumption was unavailable. 578 F.2d at 718. Plaintiff here has pleaded an *omissions* theory, and this court will not convert it into a case of misrepresentation, just as the *Vervaecke* court would not convert a misrepresentation theory into one of omission.

■ Second, *Vervaecke* involved positive proof of reliance rather than rebuttal of the *Affiliated Ute* presumption of reliance. Whereas the burden of proof was upon Vervaecke to establish reliance, here "the bur-

den of proof rests squarely upon the defendant" "to demonstrate that there was *clearly* no reliance." *St. Louis Union Trust*, 562 F.2d at 1049 (emphasis added). This shifting of the burden could be determinative on close questions of fact.

■ Finally, Vervaecke's investment decision "was influenced primarily by factors personal to him and *unrelated to the alleged misrepresentations and omissions*," according to the district court. 578 F.2d at 719 (emphasis added). The Eighth Circuit expressed "no opinion as to which factors did induce Vervaecke to buy." *Id.* The situation here is entirely different: plaintiffs allege that even if they did not read or receive the offering circulars prior to purchase, their decisions were based on reasons *related* to the alleged omissions of defendant because they agreed to purchase the bonds after telephonic presentations based upon the allegedly defective offering circulars. Since both the written circulars and the oral presentations omitted material facts about Woodmoor, even if they varied in other particulars, they are analytically equivalent for purposes of causation. Thus, a mere showing that some plaintiffs did not read or receive the offering circulars prior to purchase would not rebut, ipso facto, the *Affiliated Ute* presumption of reliance.[4]

■ This approach to causation is consistent with the rule as stated in *St. Louis Union Trust*: the presumption of reliance is rebutted only in those instances where defendant can clearly demonstrate that "even if the material facts had been disclosed, plaintiff's decision as to the transaction would not have been different from what it was." 562 F.2d at 1049. Therefore, to rebut the *Affiliated Ute* presumption, defendant must clearly show that even if the written circulars or oral presentations based thereon had disclosed the allegedly precarious financial condition of Woodmoor, a particular plaintiff would still have pur-

---

4. In *Shores v. Sklar*, 647 F.2d at 468, the court affirmed dismissal of plaintiff's complaint to the extent it "pleaded the usual 10b–5 misrepresentation or omission case" because plaintiff did not "read or even seek to read the Offering

Circular." *Id.* However, plaintiff "admitted that he never read or *otherwise relied* on the Offering Circular." *Id.* (emphasis added). Such is not the case here.

chased the bonds for reasons unrelated to the alleged omissions.

### B. Fraud on the Market

Plaintiffs have alleged the offering circulars affected more than individual investment decisions:

14. The market value and extent of the purchases and success of the offerings were influenced by purported disclosure statements or offering circulars (hereinafter "Disclosure Statements") issued and disseminated by Stern Brothers with respect to the proposed offerings, which Disclosure Statements purported to give full and proper disclosure of all material facts and circumstances relating to the bonds then being offered and, accordingly, members of the class relied directly or indirectly thereon.

*First Amended Complaint* ¶ 14. Although defendant takes issue with the import of this language, the court believes that plaintiffs' First Amended Complaint can be fairly construed to encompass a "fraud on the market" theory. Thus, the failure of some plaintiffs to read an offering circular prior to purchase would not necessarily dispose of their claims. If they can demonstrate that the bonds were the product of a fraudulent scheme and that they could not have been marketed had the truth been known, then a sufficient "causal nexus" between defendant's conduct and plaintiffs' injuries is established. *St. Louis Union Trust*, 562 F.2d at 1048; *Blackie v. Barrack*, 524 F.2d 891, 905–08 (9th Cir. 1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976).

*Shores v. Sklar*, 647 F.2d 462 (5th Cir. 1981), summarized above, presents a situation of striking similarity. Without first reading the offering circular, plaintiff had purchased industrial revenue bonds which were used to finance construction of a manufacturing facility. When the lessee of the newly constructed premises defaulted, the value of the bonds dropped sharply. As in *Shores*, plaintiffs here have pleaded violations of all three subsections of Rule 10b–5, thus permitting proof of violations beyond simple misrepresentations or omissions.

*Shores*, 647 F.2d at 468–69, 471–72 (and cases discussed therein). When the nature of the violation changes, it reasonably follows that the focus of causation may also shift. *Id.* at 472. *St. Louis Union Trust* speaks of a "causal nexus" which indicates recognition by the Eighth Circuit that causation may be established by something other than reliance, depending on what is appropriate for the case at hand (562 F.2d at 1048–49), and *Vervaecke* recognizes the difficulty in proving reliance in cases of non-disclosure or fraud on the market. 578 F.2d at 717.

Therefore, plaintiffs may proceed under a fraud on the market theory. This court recognizes that a petition for certiorari in *Shores* is now pending before the Supreme Court. *Shores v. Sklar*, 647 F.2d 462 (5th Cir. 1981), *petition for cert. filed*, 50 U.S. L.W. 3377 (U.S. Nov. 2, 1981) (No. 81–839). Should the petition be granted and the decision ultimately be reversed, this court would obviously need to reexamine this matter prior to trial.

### II. MOTION FOR DECERTIFICATION

In its motion for decertification, defendant asserts that discovery on the merits has revealed the presence of numerous individual issues which destroy the utility of the five class actions. Fed.R.Civ.P. 23(b)(3). Essentially, defendant asks for reconsideration of the original finding that common questions predominate as to each class, a possibility contemplated by Judge Collinson in his certification order of October 29, 1979. The individual questions which defendant argues are likely to arise can be grouped under the four headings which follow: statute of limitations; reliance; waiver; and common law fraud.

### A. Statute of Limitations

Defendant asserts that the claims of many class members may be barred by the statute of limitations. According to defendant, this possibility alone presents individual questions so substantial as to require decertification. The essence of defendant's argument is that the Woodmoor bankruptcy in January, 1974, and the attendant publici-

ty should have put plaintiffs on notice that something was amiss with their investments. This action was not filed until August 3, 1977, more than three and one-half years later, which leads defendant to conclude that the claims of most or all class members will be time barred.[5] Plaintiffs respond that the Woodmoor bankruptcy did not reveal the existence of the fraud because defendant concealed its wrongdoing; moreover, the districts did not begin to default on their obligations until August 21, 1975, which is within two years prior to the filing of this suit.

Neither section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C.A. § 78j(b) (West 1981)) nor Rule 10b–5 specifies a period in which actions thereunder must be commenced. *Robertson v. Seidman & Seidman*, 609 F.2d 583, 586 (2d Cir. 1979); *Vanderboom v. Sexton*, 422 F.2d 1233, 1236 (8th Cir.), *cert. denied*, 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970). "[W]hen the federal legislative act is silent as to the statute of limitations applicable to it, the limitations period of the forum state is applied." *Id.* 422 F.2d at 1237; *Robertson*, 609 F.2d at 586 (federal court should also employ any borrowing statute of the forum). If more than one limitations period arguably could be applied, then the court must utilize the " 'one which best effectuates the federal policy at issue.' " *Vanderboom*, 422 F.2d at 1237 (quoting *Charney v. Thomas*, 372 F.2d 97, 100 (6th Cir. 1967)). The Eighth Circuit has held that the 2-year limitations period of the Missouri blue sky statute (Mo.Ann. Stat. § 409.411(e) (Vernon 1979)) generally should be applied in Rule 10b–5 actions commenced in Missouri federal courts. *Morris v. Stifel, Nicolaus & Co.*, 600 F.2d 139 (8th Cir. 1979).

"State law provides no more than the limitations period; when the cause of action accrues, the date the statute begins to run, and the circumstances that toll it, are determined under the federal common law." *Campbell v. Upjohn Co.*, 498 F.Supp. 722, 726 (W.D.Mich.1980). In a Rule 10b–5 action, the statute of limitations begins running "from the date of the discovery of the fraud or from the date the fraud upon reasonable inquiry should have been discovered." *Vanderboom*, 422 F.2d at 1240. Discovery means " 'either actual knowledge or notice of facts which, in the exercise of due diligence would have led to actual knowledge of the violation.' " *Osterneck v. E. T. Barwick Industries Inc.*, 79 F.R.D. 47, 51 (N.D.Ga.1978) (quoting *Azalea Meats, Inc. v. Muscat*, 386 F.2d 5, 8–9 (5th Cir. 1967)). Aside from any question of actual knowledge, this standard is an objective one, which imposes upon potential plaintiffs a duty to " 'exercise reasonable care and diligence in seeking to learn the facts which would disclose fraud.' " *Koke v. Stifel, Nicolaus & Co.*, 620 F.2d 1340, 1343 (8th Cir. 1980) (quoting *Hupp v. Gray*, 500 F.2d 993, 996 (7th Cir. 1974)). In short, a potential plaintiff may not prolong the limitations period indefinitely simply by adopting an attitude of hear no evil, see no evil, speak no evil.

On the other hand,

The statute of limitations may be tolled if a plaintiff did not timely initiate suit because of ignorance resulting from a defendant's fraudulent concealment of the underlying facts. This equitable doctrine is read into every federal statute of limitations ... including those applicable to the securities laws.

*Campbell*, 498 F.Supp. at 727 (citations omitted). Since deception is the sine qua non of fraud, a plaintiff who seeks to invoke the protection of this equitable tolling doctrine must show that the defendant engaged in tactics of concealment which extend beyond the original, underlying fraud—*i.e.* a coverup. *See Ohio v. Peter-*

---

**5.** Defendant assumes that the 2-year period of limitations prescribed by the Missouri blue sky statute is applicable. *Morris v. Stifel, Nicolaus & Co.*, 600 F.2d 139 (8th Cir. 1979). However, plaintiffs contend the 3-year limitations period prescribed by Colorado law should instead be applied to all class members. *See State Teachers Retirement Board v. Fluor Corp.*, 80 F.R.D. 142 (S.D.N.Y.1978). For purposes of this motion, the court finds it unnecessary to decide this question.

son, *Lowry, Rall, Barber & Ross,* 472 F.Supp. 402, 409 (D.Colo.1979) (fraudulent concealment requires "something more") (Finesilver, J.), *aff'd,* 651 F.2d 687 (10th Cir.), *cert. denied,* 454 U.S. 895, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981); *Campbell,* 498 F.Supp. at 727 (burden of proof is on plaintiffs since the doctrine is in avoidance of the statute of limitations).

Assuming plaintiff can demonstrate fraudulent concealment, its impact upon the tolling of the statute of limitations is subject to differing interpretations. According to one line of authority, "the active concealment of fraudulent conduct tolls the statute of limitations in favor of the defrauded party until such time as he *actually knew* of the fraudulent conduct of the opposing party." *Robertson,* 609 F.2d at 593 (emphasis added). Other courts hold the plaintiff to a standard of due diligence, even in the face of a coverup. *See, e.g., Campbell,* 498 F.Supp. at 727. Under yet another version of the doctrine, a distinction is made between active concealment and concealment which occurs as a natural consequence of the fraud. *Sperry v. Barggren,* 523 F.2d 708, 710–11 (7th Cir. 1975). Active concealment tolls the statute until plaintiff actually discovers the fraud; otherwise, plaintiff is required to exercise due diligence to discover the fraud. *Id.; Peterson,* 472 F.Supp. at 406–07.

It is also possible, as some courts have done, to reevaluate the analytic relationship of fraudulent concealment and due diligence. Instead of considering fraudulent concealment as a basis for tolling the limitations period, it may be analyzed within the concept of due diligence, which determines when the cause of action accrues and the statute of limitations begins to run. *Osterneck,* 79 F.R.D. at 52–53.

The concept of due diligence is not imprisoned within the frame of a rigid standard; it is protean in application. A fraud which is flagrant and widely publicized may require the defrauded party to make immediate inquiry. On the other hand, one artfully concealed or convincingly practiced upon its victim may justify much greater inactivity. The presence of a fiduciary relationship or *evidence of fraudulent concealment bears heavily on the issue of due diligence.*

*Azalea Meats,* 386 F.2d at 9 (footnote omitted) (emphasis added).

One final trend in the analysis of due diligence merits mention. Since the decision in *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), to recover damages under section 10(b) and Rule 10b–5, a plaintiff must show the defendant acted with scienter, defined as "intent to deceive, manipulate, or defraud." *Id.* at 193 n.12, 96 S.Ct. at 1381 n.12. This decision prompted some circuits to reexamine that element of a 10b–5 action which requires that plaintiff's reliance on the defendant's statements be justifiable, *i.e.* that plaintiff acted with due diligence in accepting and relying on the representations of the defendant. *See, e.g., Dupuy v. Dupuy,* 551 F.2d 1005, 1014, 1017 (5th Cir.), *cert. denied,* 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977) (White, J., dissenting). This standard generally meant a plaintiff who was negligent in relying on the defendant's statements could not recover. *Id.* 551 F.2d at 1017. When a negligence standard for plaintiff was coupled with a scienter standard for defendant, a 10b–5 action took on an asymmetrical appearance unappealing to potential plaintiffs. *Holdsworth v. Strong,* 545 F.2d 687, 692–693 (10th Cir. 1976), *cert. denied,* 430 U.S. 955, 97 S.Ct. 1600, 51 L.Ed.2d 805 (1977). "If the negligence standard were being applied it might be appropriate to allow due diligence to be exacted from the victim, but where liability of the defendant requires proof of intentional misconduct, the exaction of a due diligence standard from the plaintiff becomes irrational and unrelated." *Id.* at 692. To remedy this imbalance, some circuits have held that a plaintiff falls short of the due diligence standard only if he "intentionally refused to investigate 'in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.'" *Dupuy,* 551 F.2d at 1020 (quoting W. Prosser, *Law of Torts*

§ 34 at 185 (4th ed. 1971)). At least one court has applied this relaxed standard of due diligence in the context of the commencement and tolling of the statute of limitations. *Osterneck,* 79 F.R.D. at 52. *See also Peterson,* 472 F.Supp. at 409 n.10.

■ After reviewing the legal principles just set forth, the court is unconvinced by defendant's argument that application of the statute of limitations requires decertification. Assuming *arguendo* that individual limitations questions are present, they do not rise to a level requiring decertification. *Cameron v. E. M. Adams & Co.,* 547 F.2d 473, 478 (9th Cir. 1976); *In re Commonwealth Oil/Tesoro Petroleum Securities Litigation,* 484 F.Supp. 253, 258 (W.D.Tex. 1979). Since questions of due diligence and fraudulent concealment also bear on the substance of plaintiffs' claims, this court is reluctant in effect to pass on the merit of those claims in the guise of a motion for decertification. *Id.* at 257. Moreover, application of the legal principles set forth above may eliminate many, if not all, limitations questions, as the following observations illustrate.

■ First, plaintiffs have alleged that defendant fraudulently concealed its prior omissions regarding the financial condition of Woodmoor and the districts. If plaintiffs can prove that allegation, then the statute of limitations is tolled. According to one line of authority, the limitations period would not commence until the defrauded party acquires actual knowledge of the wrongdoing. *See, e.g., Robertson,* 609 F.2d at 593. This standard is advantageous to plaintiffs since presumably most class members would acquire actual knowledge at a point later than that at which they could be charged with constructive knowledge of the fraud. Although in theory this might require individual examination of each class member in ancillary proceedings, as a practical matter the inquiry would be limited to only those class members who defendant reasonably suspects possessed actual knowledge of the fraud prior to August 3, 1975, or August 3, 1974, depending on which statute of limitations is ultimately applied herein (*see* note 5 *supra*).

If on the other hand, plaintiffs are held to a standard of due diligence even in the face of fraudulent concealment, questions of limitation present even fewer obstacles to maintenance of a class action. Contrary to the assertions of defendant, it is abundantly clear that due diligence is an objective test subject to class-wide application. *See Koke,* 620 F.2d at 1343; *Tesoro,* 484 F.Supp. at 257–58. "All class members are charged with knowledge of the information in the public domain"; therefore, it would not be necessary to evaluate the mental state of each class member. *Id.* at 258. Moreover, if the *Osterneck* test of due diligence (a recklessness standard) is employed, most limitations questions would probably evaporate since the only claims barred would be those of class members who, at a point in time earlier than allowed by the applicable statute of limitations, intentionally refused to investigate in the face of obvious indications of fraud.

### B. Reliance

In its second major argument in support of decertification, defendant asserts that discovery has revealed numerous individual issues concerning class members' reliance on the allegedly defective bond offering circulars. Many of the points raised by defendant have already been addressed in the discussion of the summary judgment motion; therefore, their treatment here will be brief.

■ Causation in fact is an essential element of a cause of action under Rule 10b–5. *St. Louis Union Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 562 F.2d 1040, 1048 (8th Cir. 1977), *cert. denied,* 435 U.S. 925, 98 S.Ct. 1490, 55 L.Ed.2d 519 (1978). As the court has already stated, plaintiffs here may establish this element using either the *Affiliated Ute* presumption of reliance or a fraud on the market theory. Regardless of which method of proof plaintiffs ultimately select, the court does not foresee insurmountable obstacles to the continued maintenance of the class actions.

■ Defendant argues that rebuttal of the *Affiliated Ute* presumption will inject

numerous individual questions into the case, but given the force of the presumption, the spectre of individual trials may be illusory: the burden will rest "squarely upon the defendant" "to demonstrate that there was *clearly* no reliance." *St. Louis Union Trust*, 562 F.2d at 1049 (emphasis added). Moreover, the possibility that the *Affiliated Ute* presumption may be rebutted as to some class members is simply an inadequate reason to decertify the classes. "[T]he varying amounts and kinds of knowledge that may have been possessed by different class members, whether misrepresentations by broker/dealers or information gleaned from the press, does not preclude class treatment where what is alleged is a complete failure to disclose critical facts." *Friedlander v. City of New York*, 71 F.R.D. 546, 549 (S.D. N.Y.1976). *See also Hurwitz v. R. B. Jones Corp.*, 76 F.R.D. 149, 170 (W.D.Mo.1977). *In re LTV Securities Litigation*, 88 F.R.D. 134, 143 n.4 (N.D.Tex.1980).

If plaintiffs employ a fraud on the market theory, individual issues of reliance virtually disappear because a sufficient causal link is established by the mere presence of the bonds in the marketplace. Individual questions of knowledge and reliance simply become irrelevant.

### C. Waiver

■ Defendant's Amended Answer to the First Amended Complaint pleads waiver as an affirmative defense, which defendant also offers as yet another reason to decertify the classes. The court agrees with defendant's premise that waiver can be asserted as a defense to an action under Rule 10b–5. *Royal Air Properties, Inc. v. Smith*, 312 F.2d 210, 213–14 (9th Cir. 1962), *appeal after remand*, 333 F.2d 568, 571–72 (9th Cir. 1964). The court cannot agree, however, that alleged individual questions of waiver in any way warrant decertification.

According to the decided weight of authority, "[w]aiver of rights under the Securities Exchange Act of 1934 should be limited to cases where it is intentional." *Childs v. RIC Group, Inc.*, 331 F.Supp. 1078, 1083 (N.D.Ga.1970), *aff'd mem.*, 447 F.2d 1407

(5th Cir. 1971). "[W]aiver presupposes knowledge of one's rights and an intent to relinquish them." *Fey v. Walston & Co.*, 493 F.2d 1036, 1050 (7th Cir. 1974). "[T]he key element of waiver" is "actual knowledge on the part of the plaintiffs of their right to relief . . . ." *Holmes v. Bateson*, 434 F.Supp. 1365, 1386 (D.R.I.1977), *aff'd in part and rev'd in part on other grounds*, 583 F.2d 542 (1st Cir. 1978).

Plaintiffs allege defendant consistently failed to disclose and actually concealed information concerning the financial condition of Woodmoor. If proven, it would follow that plaintiffs lacked the knowledge essential to an effective waiver. As stated in *Andrews v. Blue*, 489 F.2d 367, 375 (10th Cir. 1973), "To have an effective estoppel or waiver there must be full knowledge on the part of the plaintiff. Where, as here, the crucial information was withheld or concealed the crucial element is not present."

■ Defendant also argues that some class members made a "second investment decision" when they decided not to sell the bonds after the collapse of Woodmoor. The court is unimpressed by defendant's attempt to transplant a mitigation of damages doctrine into the area of waiver. *See Nye v. Blyth Eastman Dillon & Co.*, 588 F.2d 1189, 1198 (8th Cir. 1978). The argument may also rest upon a false premise since plaintiffs dispute the existence of a secondary market for the bonds after their dubious value became apparent. In addition, the mere possibility that some plaintiffs actually may have chosen not to sell their bonds after the Woodmoor bankruptcy could not be construed as a waiver unless it could be shown that the plaintiffs then had full knowledge of the fraud. Under plaintiffs' theory of the case, the full details of defendant's fraud did not emerge until well after Woodmoor's bankruptcy.

It thus appears most unlikely that waiver will develop as a substantial issue at trial, assuming plaintiffs can prove their allegations. Should it develop that some (probably few) class members, knowing the full details of the alleged fraud, thereafter waived their rights, then the court in coop-

eration with the parties can fashion an appropriate method for consideration of the issues raised.

## D. Common Law Fraud

■ Finally, defendant contends that the common law fraud alleged in Count II of the complaint is simply unsuitable for class treatment. Defendant offers two illustrations of the problems it foresees. First, the *Affiliated Ute* presumption of reliance does not extend beyond the statutory action, thus each class member will have to prove reliance. Second, the elements of a fraud claim will vary with the residence of each plaintiff, thus injecting individual issues of law into the case.

Defendant cites a number of cases which support its position; however, several of them involve refusals to grant class certification of federal securities claims as well as state common law claims. *See, e.g., Ingenito v. Bermec Corp.*, 376 F.Supp. 1154, 1170 (S.D.N.Y.1974). Such circumstances obviously present less compelling reasons for a federal court to exercise pendent jurisdiction over the remaining state claim. *Id.* On the other hand, defendant has cited cases wherein the court granted class certification of the federal claims while denying certification of a pendent common law fraud claim. *See, e.g., Seiden v. Nicholson*, 69 F.R.D. 681, 686 (N.D.Ill.1976). However, this court is simply unconvinced that decertification of the common law fraud claim in Count II is warranted at present, for the reasons that follow.

First, it appears that the similarities between a Rule 10b–5 action and common law fraud outnumber the differences. *See generally Dupuy v. Dupuy*, 551 F.2d 1005, 1014 (5th Cir.), *cert. denied*, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977); 37 Am.Jur.2d *Fraud & Deceit* § 12 (1968). Class treatment of both claims will permit efficient presentation of proof on overlapping issues such as defendant's scienter and the financial condition of Woodmoor. "We believe that considerations of judicial economy and the best interests of the parties in terms of fairness and convenience compel the conclusion that all claims should be heard in one proceeding." *Travis v. Anthes Imperial Ltd.*, 473 F.2d 515, 528 (8th Cir. 1973). *Accord, Cameron v. E. M. Adams & Co.*, 547 F.2d 473, 478–79 (9th Cir. 1976) (pendent statutory claims). *See also Vanderboom v. Sexton*, 422 F.2d 1233, 1241–42 (8th Cir.), *cert. denied*, 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970) (pendent common law fraud claim in a nonclass setting). The court acknowledges that individual proof of reliance may pose difficulties in case management, unless plaintiffs are accorded the benefit of an inference or presumption akin to that announced in *Affiliated Ute*. But see *Tober v. Charnita, Inc.*, 58 F.R.D. 74, 85 (M.D.Pa.1973) ("Nor are we willing to avoid the problem by removing individual reliance as an essential element of common law fraud"). Nevertheless, this court believes in those instances where reliance is genuinely disputed, the parties and the court should be able to fashion a workable arrangement for trying the issue without destroying the efficacy of class proceedings on other issues. *Cf. Blackie v. Barrack*, 524 F.2d 891, 906–07 n.22 (9th Cir. 1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976) ("We think procedures can be found and used which will provide fairness to the defendants and a genuine resolution of disputed issues while obviating the danger of subverting the class action with delaying and harassing tactics").

■ Second, variations in the elements of fraud among the states need not defeat certification. Neither defendant, nor the cases it cites, analyze the "problem" in detail. This court will not decertify these classes simply because there *may* be variations among the states. No substantive variations have been shown; moreover, it is unclear just how many states are involved. It is conceivable that defendant's conduct should be evaluated under the law of that state with the most significant contacts to the underlying transaction. Perhaps both sides should explore the possibility of trying this case under the common law principles of one agreed state rather than several. *Cf. State Teachers Retirement Board v. Fluor Corp.*, 80 F.R.D. 142, 145 (S.D.N.Y.

1978) (announcing intention to apply one statute of limitations to Rule 10b–5 claims of class members from several states).

Defendant does argue specifically that Colorado class members may be unable to recover punitive damages under their common law claim. Without expressing any opinion on the merits of the argument, the court simply notes that damages are routinely resolved individually without destroying the efficacy of a class-wide determination of liability. *See Hurwitz v. R. B. Jones Corp.*, 76 F.R.D. 149, 171 (W.D.Mo.1977). Even if defendant's point is well taken, the additional burden on the court would be minimal.

### III. CONCLUSION

For the reasons stated, it is

ORDERED that defendant's Motion for Summary Judgment is denied. It is further

ORDERED that defendant's Motion to Decertify the Class Actions is denied. It is further

ORDERED that a pretrial conference will be held in the court's chambers at 10 a. m. on Friday, June 18, 1982, at which time this matter will be set for trial.