644 F.2d 690
 Fed. Sec. L. Rep. P 97,879
G. A. BUDER, III; Christy L. Buder; G. A. Buder, IV; M.
Leslie Buder and G. A. Buder, III; as next friend
for his minor child, Douglas L. Buder, Appellants,
v.
MERRILL LYNCH, PIERCE, FENNER & SMITH, INCORPORATED, and Ray
Dusek, Jr., Appellees.
 No. 80-1162.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 16, 1980.
Decided Feb. 19, 1981.
 
 Lashly, Caruthers, Thies, Rava & Hamel, A Professional Corp., Charles E. Valier, Judson W. Calkins, St. Louis, Mo., for plaintiffs-appellants.
 John J. Cole, Armstrong, Teasdale, Kramer & Vaughan, St. Louis, Mo., for defendants-appellees.
 Before HEANEY, ADAMS,* and STEPHENSON, Circuit Judges.
 HEANEY, Circuit Judge.
 
 
 1
 G. A. Buder, III, and four of his children, commenced this action on June 13, 1977, alleging that Merrill Lynch, Pierce, Fenner & Smith, Inc., and Ray Dusek, one of its brokers, committed various federal securities acts' violations. The primary securities provisions on which plaintiffs rely are section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b-5 of the Securities and Exchange Commission (17 C.F.R. § 240.10b-5 (1979)).[1] The substance of the Buders' complaint is that Dusek, acting on behalf of Merrill Lynch, failed to disclose the risk attendant to purchase by the plaintiffs of real estate investment trust securities ("REITs"). The plaintiffs seek over $800,000 in damages, representing the purchase price of the REITs and various interest costs.
 
 
 2
 The parties have engaged in extensive discovery, through depositions, interrogatories and production of documents. The case has been set for trial seven times. While this action was pending, our Court ruled in Morris v. Stifel, Nicolaus & Co., 600 F.2d 139 (8th Cir. 1979), that section 10(b) securities claims commenced in Missouri federal courts were subject to the two-year statute of limitations of that state's blue sky law[2] rather than the five-year period for common law fraud claims. Soon after the Morris decision was filed, the defendants moved for summary judgment, claiming that Buders' action was time barred.
 
 
 3
 Argument was heard on the summary judgment motion on October 19, 1979, and the case was taken under submission by Judge Regan.[3] Four days later, the plaintiffs sought leave to file an amended complaint, alleging a separate count for common law fraud. Jurisdiction for that claim was based on diversity of citizenship.
 
 
 4
 On February 1, 1980, the district court sustained the defendants' motion for summary judgment and denied leave to file the amended complaint. The plaintiffs challenge both of these rulings on appeal. We affirm the district court's grant of the summary judgment motion on the 10b-5 claim, but hold that the court abused its discretion by denying the plaintiffs leave to amend.
 
 
 5
 * SUMMARY JUDGMENT
 
 
 6
 The appellants contend that the district court erred in granting the defendants' motion for summary judgment. The standard to be applied in reviewing the grant of this motion is whether it has been shown "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see Morris v. Stifel, Nicolaus & Co., supra, 600 F.2d at 140. We conclude that the defendants in this action have met their burden of establishing, as a matter of law, that the plaintiffs' 10b-5 claim is barred by the statute of limitations.
 
 
 7
 We note preliminarily that a motion for summary judgment is an appropriate method for raising a statute of limitations' defense. Morris v. Stifel, Nicolaus & Co., supra, 600 F.2d at 140. The Court will refuse to grant summary judgment for the defendants if there is an issue of fact as to when the limitations period began. See 10 Wright and Miller, Federal Practice and Procedure § 2734, n.31 at 651; Dzenits v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 494 F.2d 168, 171 (10th Cir. 1974). However, where it is clear that the plaintiffs cannot, as a matter of law, refute the defendants' plea of limitations, summary judgment may be granted. See In re Alodex Corp. Securities Litigation, 533 F.2d 372 (8th Cir. 1976); Turner v. Lundquist, 377 F.2d 44 (9th Cir. 1967).
 
 
 8
 The two-year limitations period for plaintiffs' 10b-5 claim runs from the date of the discovery of the fraud or from the date the fraud upon reasonable inquiry should have been discovered. Vanderboom v. Sexton, 422 F.2d 1233, 1240 (8th Cir.), cert. denied, 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970). Thus, it is not only the subjective judgment of the defrauded party that is relevant. Commencement of the period is also tested by an objective standard of reasonable diligence on the part of the plaintiff in discovering the fraud. Cf. Fox v. Kane-Miller Corp., 542 F.2d 915 (4th Cir. 1976).
 
 
 9
 The district court held that G. A. Buder, III, knew or should have known about the defendants' alleged fraudulent acts more than two years before the case was filed on June 13, 1977. The plaintiffs last purchase of REITs was made in December, 1973. The plaintiffs' complaint alleges that prior to this purchase, and all their other REITs purchases, the defendants represented that these were sound securities, promising high yields and growth possibilities with little attendant risk. The district court relied on Buder's deposition testimony and various documents furnished to him after the purchases to conclude that the falsity of these alleged representations should have been apparent to him before June 13, 1975. The court was not persuaded by Buder's testimony that he does "not recall" reading the reports furnished him, or that Dusek, his broker, told him not to pay attention to the adverse information contained in them. The court stated that
 
 
 10
 Buder may not deliberately close his eyes to the information available to him which would demonstrate to any reasonable person (and to Buder in particular as a sophisticated investor) that the alleged representations of Dusek as to the soundness and lack of risk of REITs for investment purposes could not have been true.
 
 
 11
 We have carefully reviewed the record and find that there is no genuine issue of fact as to whether G. A. Buder, III, had actual or constructive knowledge of the alleged fraud prior to June 13, 1975. Buder was in possession of a great deal of information about the sorry state of his REIT investments prior to this date. He received a number of research reports from Merrill Lynch describing problems in the REIT-industry generally. One of these, dated March 20, 1974, stated:
 
 
 12
 The shares of REITs have been out of favor for more than a year due to the severe problems which the industry has been facing. Earnings have been restricted due to high interest rates, increasing building costs and problem loans. Many of the industrys (sic) problems seem likely to persist during 1974 and into 1975. Thus, we are tempering our opinion on a number of trusts. In general, we believe new investments in the industry should be avoided, as the risks are very high and the outlook is not at all clear * * *.
 
 
 13
 Another research report, dated April 22, 1974, stated that "(t)he REIT industry is beset by a number of very serious problems," and detailed the effect that serious financing and liquidity problems were having on the REITs' earnings and profitability. On July 3, 1974, Merrill Lynch released a report headlined "changes in opinion," which stated the firm's belief that "the continued high cost of money will severely limit the recover potential of many trusts." It went on to say that although some trusts may be attractive in the long term, "at no time have we ever been so bearish about the short term prospects for the industry * * *. In sum, we expect prices for shares of most trusts to continue to erode because of the current problems facing the industry."
 
 
 14
 Buder also received adverse financial and market information regarding the specific REITs he had invested in. Annual and quarterly reports from the companies, Merrill Lynch research reports addressed to individual REITs and communications from Dusek, revealed sharp declines in the market prices, book values, earnings, and dividends paid by the REITs in the Buders' portfolios.[4] G. A. Buder, III, admitted that by April, 1975, he was aware of substantial losses and deficits incurred by one of his major REIT investments, Independence Mortgage Company.
 
 
 15
 The totality of the information received by Buder prior to June 13, 1975, was clearly sufficient to have put him on notice of the alleged fraud. See Turner v. Lundquist, supra, 377 F.2d at 48. The facts were such as to "excite inquiry" in Buder; the statutory period "need not await his 'leisurely discovery of the full details' regarding his claim." In re Alodex Corp. Securities Litigation, 392 F.Supp. 672, 684 (S.D.Iowa 1975), aff'd, 533 F.2d 372 (8th Cir. 1976); Klein v. Bower, 421 F.2d 338, 343 (2d Cir. 1970).II
 
 LEAVE TO AMEND
 
 16
 We do, however, find merit in appellants' contention that the district court erred in denying them leave to file an amended complaint. Rule 15(a) of the Federal Rules of Civil Procedure permits amendments to a plaintiff's pleading after the defendant has filed an answer, by leave of court or written consent of the opposing parties. As the Supreme Court noted in Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962),
 
 
 17
 Rule 15(a) declares that leave to amend "shall be freely given when justice so requires"; this mandate is to be heeded * * *. If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claims on the merits.
 
 
 18
 The standard of review by the Court of Appeals is whether the district court abused its discretion in granting or denying leave to amend. Norbeck v. Davenport Community School Dist., 545 F.2d 63, 70 (8th Cir. 1976), cert. denied, 431 U.S. 917, 97 S.Ct. 2179, 53 L.Ed.2d 227 (1977). We conclude that the trial court's ruling was not in keeping with the liberal amendment policy of Rule 15(a), and constituted an abuse of its discretion.
 
 
 19
 The reasons cited by the district court in denying the plaintiffs leave to amend do not withstand scrutiny. The court placed great reliance on the two and one-half year delay between the filing of the complaint and plaintiffs' request for leave to amend. However, it is well-settled that delay alone is not a sufficient reason for denying leave. See Mercantile Trust Co. Nat'l Ass'n v. Inland Marine Products Corp., 542 F.2d 1010, 1012 (8th Cir. 1976). The delay must have resulted in prejudice to the party opposing the motion. See Beeck v. Aquaslide 'N' Dive Corp., 562 F.2d 537 (8th Cir. 1977). In this case, the district court stated that prejudice to the defendants would result if the amendment were allowed. The court did not, however, state in what way the defendants were prejudiced by the plaintiffs' delay, and we are convinced that no significant prejudice did result.
 
 
 20
 The "facts" underlying the plaintiffs' 10b-5 claim are substantially similar to those which form the basis of their common law fraud claim. Where the facts on which a previously unasserted claim is based are all known or available to all parties, there is no prejudice in allowing an amended complaint. See Thomas v. American Cystoscope Makers, Inc., 414 F.Supp. 255 (E.D.Pa.1976). To the extent that some additional discovery may be necessary, it is well within the district court's power to alleviate the resulting burden on the defendants by granting a continuance or compensating them for any loss occasioned by the plaintiffs' delay. Importantly, there is nothing in the record or the parties' briefs to indicate that the defendants are less able to conduct any necessary additional discovery at this time than they would have been if the plaintiffs' motion to amend had been filed earlier.
 
 
 21
 Further, the defendants are in no position to complain that the amendment would deny them the right to a speedy and inexpensive trial. The case was continued and reset for trial seven times by agreement of both parties. Counsel had agreed to postpone trial of plaintiffs' 10b-5 claims until this Court definitively ruled on the relevant statute of limitations for such actions. As anticipated, this Court's ruling in Morris, establishing a two-year statute of limitations, disposed of plaintiffs' 10b-5 claims. It is not reasonable to assume that if the plaintiffs had amended their complaint earlier, the defendants would have chosen to proceed to trial on the two theories rather than waiting for the Morris ruling.
 
 
 22
 It is clear that even where some prejudice to the adverse party would result if the motion to amend were granted, that prejudice must be balanced against the hardship to the moving party if it is denied. See Scott v. Crescent Tool Co., 306 F.Supp. 884, 886 (N.D.Ga.1969). In this case, there is significant hardship to the plaintiffs. As a result of the court's ruling, the Buders have been denied a trial on the merits of their fraud claim.[5]
 
 
 23
 G. A. Buder, III, testified in his deposition that Dusek, acting on behalf of Merrill Lynch, represented that the REITs were a "fine vehicle for investment," suitable for his account and those of his minor children. According to Buder, the defendants knew, or reasonably could have ascertained, adverse information concerning the current value, yields, prospects for growth and level of risk of the securities, information which rendered the misrepresentations materially false and misleading. On the basis of the record, we cannot say that genuine factual issues are not present as to plaintiffs' right to recover for these alleged misrepresentations.
 
 
 24
 This result is not affected by the extensive information concerning the REIT investments that G. A. Buder, III, received from 1973-1975. That information should have prompted Buder to timely file the 10b-5 action and may limit the plaintiffs' recovery to the damages sustained before a reasonable investor in possession of such information would have sold the REITs. However, the Buders' purchases were made in 1972-1973, before the companies reported the adverse financial and market information outlined above, and perhaps were entered into without sufficient knowledge as to the speculative nature of the investment.
 
 
 25
 The district court's decision to deny plaintiffs' motion to amend their complaint may have been based, in part, on a perception that the plaintiffs were unlikely to succeed on the merits of their claim. The amendments should be denied on this basis only if they assert clearly frivolous claims or defenses. See Norbeck v. Davenport Community School Dist., supra, 545 F.2d at 70; Harvey v. Eimco Corp., 32 F.R.D. 598, 600 (E.D.Pa.1963). The district court's order contained no such finding.
 
 
 26
 Finally, we note that the district court concluded that the plaintiffs had intentionally refrained from asserting their common law fraud claim earlier and that this constituted "bad faith." We are not convinced that a party's opportunity to amend should be defeated, in absence of prejudice to the opposing party, merely because he tactically chooses to delay assertion of a claim or defense. The plaintiffs in this case apparently preferred to proceed under the federal securities law provisions, and only proffered their common law fraud claim when the Morris decision precluded their federal claims. They should not have been required to proceed on both theories, particularly when the two claims, if tried simultaneously, might confuse the jury.
 
 
 27
 The district court's judgment with respect to the plaintiffs' motion for leave to file an amended complaint is accordingly reversed. We remand to the district court with directions to it to allow the plaintiffs to file an amended complaint.
 
 
 
 *
 The HONORABLE ARLIN M. ADAMS, United States Circuit Judge for the Third Circuit Court of Appeals, sitting by designation
 
 
 [1]
 The plaintiffs also brought suit under sections 12(2) and 17(a) of the Securities Act of 1933, and section 15(c)(1) and (2) of the Securities Exchange Act of 1934. These claims were dismissed by the lower court and that ruling is not challenged on appeal
 
 
 [2]
 Mo.Ann.Stat. § 409.411(e) (Vernon) (1980)
 
 
 [3]
 United States District Judge for the Eastern District of Missouri
 
 
 [4]
 The Buders' complaint is based on their purchases of shares in four individual REITs: Continental Mortgage Investors, C. I. Mortgage, Sutro Mortgage and Independence Mortgage. The most extensive information in Buder's possession concerned the troubled state of the REIT in which his and the children's assets were concentrated: Independence Mortgage. The market price of that REIT declined from 247/8 on October 3, 1972, to 141/2 on November 19, 1973. On March 10, 1975, the bid price of Independence Mortgage was 5/8, the asked price, 7/8. The book value of the stock also declined significantly during this period, from 22.95 on December 19, 1973, to 18.40 on March 31, 1974; on April 4, 1975, the book value was only 12.73. Independence Mortgage reported an $11 million loss for the quarter ending March 31, 1974, as compared to a profit of over $329,000 for the preceding quarter. The company's loss for the year ending June 30, 1974, totaled $19 million; their June 30, 1973, report had reflected earnings of $7 million
 C. I. Mortgage's 1974 annual report, produced from Buder's file, reflected similarly adverse news. That company sustained a $10 million loss for the year ending October 31, 1974, as compared to a $9 million profit for the previous year.
 Sutro Mortgage reported a $191,000 loss for the quarter ending December 31, 1974. A Merrill Lynch research report, dated January 14, 1975, recommended that Sutro investors "sell," a downgraded rating from the "OK to buy" recommendation contained in a January 23, 1973, report.
 Dividends paid by the four REITs in the Buders' portfolio declined significantly. G. A. Buder, III, received $12,995 in dividends paid on the Independence Mortgage shares in his account in 1973. Independence Mortgage paid no dividends in 1974. Dividends paid to Buder by C. I. Mortgage declined from $6,200 in 1973 to $2,077 in 1974. Continental Mortgage Investors paid $218 in 1973, $96 in 1974. Buder's dividends from Sutro Mortgage declined from $13,480 to $9,000 in 1974 and $2,500 in 1975.
 
 
 [5]
 The plaintiffs' motion for leave to amend was designed to take advantage of Rule 15's "relation back" provision. Rule 15(c) provides that "(w) henever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading." The plaintiffs cannot institute a new action on their common law fraud claim, based on allegedly fraudulent conduct occurring between 1972 and 1975, as it would be barred under either of the two potentially applicable statutes of limitation
 We do not decide the question of whether the timeliness of plaintiffs' amended complaint would be governed by the general statute of limitations governing common law fraud (R.S.Mo. § 516.120), or by the limitations period of the state's Blue Sky statute (R.S.Mo. § 409.411(e)). The common law fraud limitations period is five years; the limitations period for suits under the Blue Sky statute is two years. This issue was not raised in the lower court or on appeal. It should be decided in the first instance by the district court upon remand.