**Zickie Z. MALOLEY, Petitioner,**

v.

**R.J. O'BRIEN & ASSOCIATES, INC.; Robert Gottsch; Clifford Spencer Roberts; and Commodity Futures Trading Commission, Respondents.**

No. 86–1533.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 12, 1986.

Decided May 19, 1987.

Judgment June 12, 1987.

Rehearing and Rehearing En Banc Denied Aug. 13, 1987.

Robert L. Nefsky, Lincoln, Neb., for petitioner.

Edward S. Geldermann, Washington, D.C., for respondents and the Commodity Futures Trading Com'n.

Before HEANEY, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and HUNTER,* Senior District Judge.

HEANEY, Circuit Judge.

This case presents the question whether certain reparations claims before the Commodity Futures Trading Commission (CFTC) were brought within the applicable statute of limitations period. We affirm in part, reverse in part, and remand the case to the CFTC for further consideration.

## I. BACKGROUND.

In April of 1978, appellant, Zickie Maloley, opened a nondiscretionary commodity account with Clifford Roberts, an associate with the Lexington, Nebraska, office of R. J. O'Brien & Associates (RJOB), a family owned and operated futures commission merchant with its principal offices in Chicago, Illinois. Roberts was in charge of the day-to-day operations of the Lexington office. He reported to Robert Gottsch, another RJOB associate, who was some 300 miles away in Elkhorn, Nebraska. At the time Maloley opened the account, he ran a grocery store and a meat store which together grossed in excess of $2.7 million annually. Maloley has a high school education and, prior to his commodity trading activity, had made a few stock investments and had read various financial publications.

Shortly after Maloley opened the account, Karen Jeffrey, an associate with Peavey Company, a competing commodities futures merchant with whom Maloley also had an account, informed him that Roberts was not registered with the CFTC as required by law. In fact, Roberts did not become registered until January of 1979. It is undisputed that Maloley did not actually learn Roberts was unregistered until September of 1979. It is also undisputed that, at some point, Maloley inquired of Roberts as to his registration and that Roberts informed Maloley he was registered but had not yet received his registration card from the CFTC. There is disagreement as to the date Maloley made this inquiry.

In June of 1978, Maloley became aware of an unauthorized trade in his account and brought it to Roberts' attention. Roberts responded that the trade was a mistake and would be rectified. Later in June and July of 1978, Maloley noticed more unauthorized trades, and losses in his account began to mount. Throughout the life of the account, however, Roberts continually assured Maloley that he would be "taken care of" provided he continued to meet margin calls and to allow Roberts and Gottsch to manage the account as they wished. Maloley did not complain to Gottsch or RJOB about the unauthorized trades and, during July and August, deposited some $105,000 into the account to meet margin calls.

In July of 1978, Maloley and Roberts opened a joint commodity trading account under the name of Mr. Z's Meats. Each contributed $1,200 to the account and agreed that they would place one trade per day. Roberts was soon making up to ten trades a day in the account, telling Maloley that this was necessary to make up the losses being incurred. During the life of the Mr. Z's Meats account, Maloley deposited or transferred $42,584.50 into the account and Roberts tendered $12,700 as his share of its losses. Thus, Maloley's total out-of-pocket losses on Mr. Z's Meats account were $29,884.50.

By mid-January, 1979, Maloley's personal account showed a deficit of $15,000 and he ceased trading until mid-April when Rob-

* The HONORABLE ELMO B. HUNTER, Senior United States District Judge for the Western District of Missouri, sitting by designation.

erts credited the account in the amount of $15,293.50. Maloley then resumed trading and sustained losses until he closed his account in June, 1979. All told, Maloley's out-of-pocket losses on his personal account amounted to $167,815.50. Combined with his out-of-pocket losses in the Mr. Z's Meats account, Maloley lost some $197,700.

On May 5, 1981, Maloley filed a complaint with the CFTC pursuant to section 14(a) of the Commodity Exchange Act (CEA), as amended, 7 U.S.C. § 18(a), against Roberts, Gottsch, Kremke (an RJOB account executive who worked with Roberts), and RJOB (collectively the appellees). The complaint alleged, inter alia, that Roberts fraudulently induced Maloley to open a commodity futures account by failing to disclose and misrepresenting his registration status in violation of sections 4b(A) and 4b(B) of the CEA, 7 U.S.C. §§ 6b(A), 6b(B) and that Roberts falsely assured Maloley account losses would be rectified, in violation of sections 4b(A), 4b(B), and 4b(C) of the CEA, 7 U.S.C. §§ 6b(A), 6b(B), 6b(C).[1] The appellees responded that the applicable two-year statute of limitations barred Maloley's claims. A hearing on the matter was held before an ALJ on April 27–29, 1983, and on September 12, 1983.

On September 24, 1984, the ALJ issued a decision finding that as to the fraudulent inducement claim, although Maloley had no duty to inquire as to Roberts' registration at the time he opened his account, he had a duty to make such an inquiry after being warned by Jeffrey. The ALJ further found that Maloley made such an inquiry, that Roberts stated he was registered, and that Maloley had a right to rely on Roberts' statement. Thus, the ALJ held that the statute of limitations on Maloley's claim did not begin to run until Maloley actually learned of Roberts' nonregistration in September of 1979 and that Maloley's claim was filed well within the two-year limitations period.

As to Maloley's fraudulent assurances claim, the ALJ found that although the bulk of the losses sustained by Maloley occurred outside of the two-year period preceding the filing of the complaint, the fraud alleged was the assurances given by Roberts that losses would be covered. Thus, the ALJ found that Maloley could not be reasonably expected to discover the fraud during the period in which the assurances were made. This period ended at the time Maloley closed his account in June of 1979. Therefore, the ALJ held that Maloley brought his claim for fraudulent assurances within the statute of limitations.

The appellees then appealed the ALJ's decision to the CFTC. On review of Maloley's fraudulent inducement claim, the CFTC agreed with the ALJ that Maloley had no duty to inquire about Roberts' registration until he was warned by Jeffrey. The CFTC, however, further found that Maloley did not exercise reasonable diligence in ascertaining whether Roberts was registered because he may not have inquired until January of 1979, some eight months after he was warned and even then, asked only Roberts—the subject of the warning. Thus, the CFTC concluded that the statute of limitations barred Maloley's claim for fraudulent inducement because he failed to show he exercised reasonable diligence in discovering the claim.

With respect to Maloley's claim for fraudulent assurances, the CFTC held that it was unreasonable for Maloley to believe, despite substantial and mounting losses, Roberts' continued assurances that the losses would be taken care of by RJOB. The CFTC also found that Maloley was not reasonably diligent in his inquiry to those who were supposed to rectify his losses. Thus, the CFTC held that Maloley's claim for fraudulent assurances was barred by the statute of limitations because he failed to show that he exercised reasonable diligence in discovering the claim.

---

1. Maloley's complaint also sought damages for unauthorized trading, churning, manipulation, and improper order execution. In his initial decision, the ALJ dismissed these claims as ei-

ther barred by the statute of limitations or vague and speculative. Maloley did not appeal the dismissals to the CFTC and does not challenge them in this Court.

## II. ANALYSIS.

It is settled law that in cases involving fraud, the cause of action does not accrue and the statute of limitations does not begin to run until the fraud is discovered or, upon reasonably diligent inquiry, should have been discovered. *See Harris v. Union Electric Co.*, 787 F.2d 355, 360 (8th Cir.1986); *Buder v. Merrill Lynch, Pierce, Fenner & Smith*, 644 F.2d 690, 692 (8th Cir.1981); *see also Graves v. Futures Investment Company*, ¶ 21,457 Fut.L.Rep. 26,158, 26,165 (CCH 1982). Maloley filed his complaint in this action on May 5, 1981. The relevant statute of limitations is two years. *See* CEA § 14(a), 7 U.S.C. § 18(a); 17 C.F.R. § 12.13 (1986). Thus, the question presented in this case is whether upon reasonable inquiry Maloley should have discovered, prior to May 5, 1979, that Roberts was unregistered and that his assurances were false.

### A. Fraudulent Inducement.

Accepting the CFTC's findings (1) that shortly after he began trading with Roberts, one of Roberts' competitors informed Maloley that Roberts was unregistered; (2) that Maloley did not inquire as to Roberts' registration for some eight months after being informed; and (3) that Maloley inquired only of Roberts, we must determine whether, in light of these findings, the CFTC erred in concluding that Maloley failed to exercise reasonable diligence in discovering the fraud he alleges.[2]

---

**2.** While, for purposes of this appeal, we accept the factual findings of the CFTC, we note that section 6(b) of the CEA, 7 U.S.C. § 9, provides that the findings of the CFTC shall be conclusive if supported by the weight of the evidence. In this regard, this Court has stated:

Unlike most other legislation providing for judicial review of agency decision, the Commodity Exchange Act (as carried forward by the Commodity Futures Trading Commission Act) declares that "the findings of the Commission as to the facts, if supported by the weight of evidence, shall be conclusive." The "weight of evidence" means "the preponderance" or "greater weight of the evidence," but the court's function "is something other than mechanically reweighing the evidence to ascertain in which direction it preponderates: it is rather to review the record with the purpose of determining whether the finder of fact was justified, i.e., acted reasonably, in concluding that the evidence, including the demeanor of the witnesses, the reasonable inferences drawn therefrom and other pertinent circumstances, supported [the] findings."

*Myron v. Hauser*, 673 F.2d 994, 1005 n. 17 (8th Cir.1982) (quoting *Haltmier v. CFTC*, 554 F.2d 556, 560 (2d Cir.1977)).

Applying the standard, the CFTC's finding that Maloley did not inquire of Roberts as to his registration until some eight months after he was warned is questionable.

In his decision, the ALJ stated:

Maloley was not derelict in not inquiring about Roberts' registration when he opened the account and trading began. However, shortly after he started trading, Maloley received a "warning" that Roberts was not registered. *At this point Maloley was obliged to inquire and he did.* Upon inquiry, Roberts told Maloley that he was registered. Maloley did not make any further inquiry or investigation but, then again, he was not required to take such action. He had a right to rely on Roberts' statement.

ALJ's decision at 14 (emphasis added).

On appeal, the CFTC found:

[B]ecause Maloley was warned by Karen Jeffrey right after he began trading with Roberts that Roberts was unregistered, Maloley had a duty at that point to inquire. According to the ALJ, Maloley did inquire and Roberts falsely replied he was registered but had not yet received his card.

What the ALJ failed to examine is *when* Maloley inquired. It is crucial to examine when Maloley inquired to determine whether he exercised due diligence in verifying Roberts' status and to assess the truth or falsity of Roberts' reply. In his pleadings Maloley stated he did not know the date he inquired of Roberts. At hearing, however, he conceded that he may have inquired in January 1979— about eight months after the warning and during the very month Roberts actually became registered.

Because Maloley conceded he may not have inquired until January 1979, he failed to show that he exercised reasonable diligence. Because he inquired only of Roberts—the very subject of the warning—Maloley also failed to act with due diligence.

CFTC decision at 9.

Review of the record reveals that Maloley testified concerning his inquiry into Roberts' registration at two points in the hearing. First he stated:

Q. Did you ever have any conversations with Mr. Roberts concerning registration?
A. Yes.
Q. When did that conversation occur?
A. Probably several occasions, on several occasions.
Q. Would they have been while Mr. Roberts was working for Mr. Gottsch?
A. Yeah.

In answering this question, we must first determine the deference to be accorded the CFTC's conclusion that a reasonable inquiry, for purposes of tolling the statute of limitations, required Maloley to inquire as to Roberts' registration within a reasonable time after receiving information that he was not registered and to inquire of someone other than Roberts. The CFTC argues that, "where, as here, the inferences to be drawn from the record relate to standards of diligence applicable to commodity customers—matters particularly within the agency's expertise, they are entitled to special deference by the reviewing court." Brief of CFTC at 14. We disagree.

Although according to section 6 of the CEA, 7 U.S.C. § 9, the CFTC's factual findings are conclusive in this Court if supported by the weight of the evidence, the section is of little help because, for purposes of this appeal, we have accepted the CFTC's factual findings. Rather, we are concerned with the conclusions the CFTC drew from the facts as it found them.

As to the proper standard of review of an agency's application of law to undisputed or established facts, it has been noted that the Supreme Court has developed two opposing lines of authority. *See Brickner v. Federal Deposit Insurance Corp.*, 747 F.2d 1198, 1201 n. 4 (8th Cir.1984); 5 K. Davis, Administrative Law Treatise, §§ 29.- 9–29.14 pp. 365–94 (1984). Under one approach, a court grants lesser deference to the agency determination, utilizing essentially a de novo standard of review. *See, e.g., Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977); *First National Bank in Sioux Falls v. National Bank of South Dakota*, 667 F.2d 708 (8th Cir.1981). Under the other approach, a court gives greater deference to the agency's conclusion, using essentially a reasonableness or rationality standard of review. *See, e.g., NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944); *Immigration and Naturalization Service v. Wang*, 450 U.S. 139, 101 S.Ct. 1027, 67 L.Ed.2d 123 (1981).

Choosing between the two standards, courts have variously labeled agency decisions to which the former standard of review has been applied as legal conclusions and those to which the latter standard of review has been applied as factual inferences. What the reported opinions generally lack, however, is some reasoned explanation for the court's choice of label.[3] None-

---

Q. And tell me what the conversations were, please.
A. Well, the conversation was that at first they hadn't sent him his license; and that's, you know, that was ninety percent of it, just they hadn't issued his license to him.
Transcript of hearing before the ALJ at 405–06.
  Later in the hearing, the subject was raised again and Maloley testified:
Q. Now, I'd like to get back to just one minor point, and that is these conversations. Could you flush out how many conversations you had relating to Mr. Roberts licensure while he was at the Lexington office there?
A. Oh, there was quite a few; and he just said they hadn't sent it yet.
Q. So you knew at that point in time, did you not, that he had a problem with getting his license?
A. No, I did not.
Q. Why do you say that?
A. Because he said he had it.
Q. He said he had what?
A. His license.
Q. He said he had just taken the test for his license?
A. No. He said he had his license. He said they just hadn't sent it to him.

Q. Would these conversations have occurred in January of '79?
A. It's possible.
Transcript of hearing before the ALJ at 410.
  Implicit in the ALJ's decision is a finding that after being warned that Roberts was not registered, Maloley made repeated and diligent inquiries as to Roberts' registration. Thus, even if we were to find, as a matter of law, that upon being warned, Maloley had a duty to inquire, we would still be left with the question whether, in light of the record before us and the ALJ's findings (which could well have rested on determinations of credibility), the CFTC reasonably concluded that Maloley did not inquire until January of 1979.

3. As Professor Davis has written in his treatise concerning the Supreme Court's treatment of this issue:
  What the Court does not do may affect results more than what it does do. The Court clearly never faces the problem of whether or how far it should substitute judgment. It does not discuss reasons for and against substituting judgment. It does not explain wherein a specialist agency may have understanding that judges usually do not have, and

theless, we are convinced that the standard applied should turn on practical policy considerations of the comparative qualifications and competencies of courts and agencies. *See Hi-Craft Clothing Co. v. NLRB,* 660 F.2d 910, 914–16 (3d Cir.1981); *Pittston Stevedoring Corp. v. Dellaventura,* 544 F.2d 35, 48–51 (2d Cir.1976), *aff'd sub nom., Northeast Marine Terminal Co. v. Caputo,* 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977).

■ In making the comparison of respective qualifications and competencies, the Court should consider the nature of the question to be decided and the role of the agency as the initial decisionmaker. With regard to the nature of the question, we agree with the *Hi-Craft* Court that "[i]f the issue falls outside the area generally entrusted to the agency, and is one in which the courts have a special competence, i.e., the common law or the constitutional law, there is little reason for the judiciary to defer to an administrative interpretation." *Hi-Craft Clothing Co.,* 660 F.2d at 915 (citing *Piper v. Chris Craft Indus.,* 430 U.S. 1, 42 n. 27, 97 S.Ct. 926, 949 n. 27, 51 L.Ed.2d 124 (1977); *Institute for Scientific Information, Inc. v. United States Postal Service,* 555 F.2d 128, 132 (3d Cir.1977)).

■ Alternatively, if the question involves an interpretation within the specialized knowledge of the agency, a court should not automatically abandon heightened review. Instead, the court should further inquire whether "the agency diet is food for the courts on a regular basis." *Hi-Craft Clothing Co.,* 660 F.2d at 915. Examples of such cases may arise in disability, trading regulation, and other areas in which courts are experienced. *See, e.g.,*

*International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America v. Daniel,* 439 U.S. 551, 566, 99 S.Ct. 790, 800, 58 L.Ed.2d 808 (1979) (little deference in securities law); *Hi-Craft Clothing Co.,* 660 F.2d at 915 (stating in dicta that little deference should be given in social security disability cases due to court familiarity with personal injury and tort cases). In such cases, courts should recognize their own competence and fulfill their responsibility to "honor the clear meaning of a statute, as revealed by its language, purpose and history." *International Brotherhood of Teamsters,* 439 U.S. at 566 n. 20, 99 S.Ct. at 800 n. 20.

■ Finally, if the question involves specialized knowledge of the agency and Congress has vested the agency with discretion in a technical area, the courts should recognize the agency's presumed competence and expertise and uphold the agency's conclusion so long as it is rationally based. *See, e.g., Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 568, 100 S.Ct. 790, 798, 63 L.Ed.2d 22 (1980) (applying the Truth in Lending Act).

■ With regard to the role of the agency as the initial decisionmaker, the proper inquiry is whether the agency's function in reaching its conclusion was more like that of an affirmative policymaker or that of an arbiter of two opposing positions.[4] Of course, the two roles often overlap. Yet, to the extent they are separable and to the extent the agency functions as an arbiter, the role is one in which courts are entirely experienced and should exercise review of a broader scope. *See, e.g., Pittston Stevedoring Corp.,* 544 F.2d at 49–50 (finding

---

it does not explain wherein judges have such understanding that a specialist agency does not have. It often wades into a problem and substitutes judgment without saying anything at all about the propriety or impropriety of doing so. When it lacks a conviction about an issue it is disinclined to decide, it invokes a formula about deference or rational basis or reasonableness, but it seldom states why it uses such a formula instead of making its own decision on the issue.
5 K. Davis, Administrative Law Treatise, § 29.11 p. 376 (1984).

4. It is important to note that only the role of the agency in drawing a specific conclusion from a given set of facts is at issue. We recognize that the court should give great deference to an agency's exercise of delegated power to formulate substantive rules and to an agency's construction of its own rules. *See Griggs v. Duke Power Co.,* 401 U.S. 424, 433–34, 91 S.Ct. 849, 854–55, 28 L.Ed.2d 158 (1971); *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449 n. 10, 96 S.Ct. 2126, 2132 n. 10, 48 L.Ed.2d 757 (1976).

less deference due to an "umpiring" agency than a policy-making agency).

▪ Selecting a standard of review in this case, we note that the CFTC's conclusion that Maloley failed to exercise reasonable diligence in discovering the fraud does not rest upon an interpretation of a specific statutory term. Indeed, the common law developed the concept of reasonable diligence in discovering a fraud before the CFTC was established. Moreover, the question of reasonable diligence in discovering a fraud in financial transactions has been "food for the courts on a regular basis" for quite some time. This is evidenced by the CFTC's reliance on judicial determinations of the issue in securities fraud cases as support for its decision in this case. *See* CFTC decision at 8 (citing *Holmberg v. Armbrecht,* 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946); *Hoffman v. Estabrook & Co.,* 587 F.2d 509, 518 (1st Cir.1978); *Cook v. Avien, Inc.,* 573 F.2d 685, 696 (1st Cir.1978); *Arneil v. Ramsey,* 550 F.2d 774, 780 (2d Cir.1977); *Hupp v. Gray,* 500 F.2d 993, 996 (7th Cir. 1974); *Klein v. Bower,* 421 F.2d 338, 343 (2d Cir.1970).

Finally, the CFTC's role as the initial decisionmaker in this case was more akin to an arbiter of two opposing positions than a policy-maker insofar as the CFTC decision serves primarily to adjust the rights of isolated private parties and only secondarily involves policymaking decisions under the CEA. In sum, this case "presents a narrow legal issue that is readily susceptible of judicial resolution," *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 120, 100 S.Ct. 2051, 2062, 64 L.Ed.2d 766 (1980), on which this Court should recognize its own competence and fulfill its responsibility to "honor the clear meaning of the statute, as revealed by its language, purpose and history." *International Brotherhood of Teamsters,* 439 U.S. at 566 n. 20, 99 S.Ct. at 800 n. 20.

In applying this standard of review to the CFTC's conclusion, it is necessary to keep in mind the central role registration plays in the regulation of commodity trading. As the Second Circuit has stated:

The intent of the congressional design is clear; persons engaged in the defined regulated activities within the commodities business are not to operate as such unless registered. * * * Registration is the kingpin in this statutory machinery, giving the Commission the information about participants in commodity trading which it so vitally requires to carry out its other statutory functions of monitoring and enforcing the Act.

*Commodity Futures Trading Commission v. British American Commodity Options Corp.,* 560 F.2d 135, 139–40 (2d Cir. 1977).

▪ Indeed, it is not overstating the case to say that if open and vigorous commodities markets are to be maintained, participants in the commodities trading business must be beyond reproach. Thus, although trading in commodities futures may be a bit of a risky endeavor, if the trader engages a reputable firm, the trader should be able to assume that the person with whom the trader transacts business and in whom the trader places confidence and trust is registered in compliance with the law.

▪ It is against this backdrop that the CFTC and the ALJ found that Maloley, like any customer, had no duty to inquire about Roberts' registration when he opened his account. We emphatically agree. The difficulty in this case arises, however, because Maloley was informed by one of Roberts' competitors that Roberts was not registered. The CFTC held that upon receiving this information, it was incumbent on Maloley to make a reasonable inquiry as to its accuracy. We disagree.

▪ The standard for what constitutes a reasonable inquiry is an objective one. *See Koke v. Stifel, Nicolaus & Co., Inc.,* 620 F.2d 1340, 1343 (8th Cir.1980). In determining whether a complainant exercised reasonable diligence in discovering a fraud, we must consider the nature of the misrepresentations and omissions, the opportunities to uncover them, and the subsequent conduct of the parties. *Hoffman v. Estabrook & Co., Inc.,* 587 F.2d 509, 518 (1st

Cir.1978) (citing *Cook v. Avien, Inc.*, 573 F.2d 685, 696–97 (1st Cir.1977). Applying the factors, and given the circumstances of the case, Jeffrey's warning was not one that, in the exercise of reasonable diligence, should have prompted further inquiry.

The fact that a broker is unregistered, is a form of misrepresentation that is not ordinarily easily discovered. One who trades with an established futures commission merchant such as RJOB will ordinarily presume that the associate with whom they are dealing is registered in compliance with applicable law. Indeed, one should be able to rely on an established futures commission merchant to police its compliance with the CEA. The idea that an established futures commission merchant would place an unregistered individual in charge of the day-to-day operations of a branch office, despite full knowledge of his nonregistration, is one that does not and should not easily take root.

Examining Maloley's opportunity to discover the fraud, it is apparent that Jeffrey's warning was not one that reasonably would lead to further inquiry. Jeffrey was a competitor of Roberts and admits that her warning was motivated by a desire to gain a larger portion of Maloley's business.[5] Additionally, despite the warning, Jeffrey testified that Maloley regularly called her from the RJOB office in Lexington to talk about the market, that she and Roberts shared information both directly and through Maloley, that her husband traded with Roberts, and that since her husband traded with Roberts, she believed she benefited from giving information to Roberts.[6] It is difficult to imagine that Maloley would reasonably be excited to further inquiry in light of the circumstances surrounding the "warning." Finally, we must take into account Maloley's location and relationship with Roberts. We can take notice of the fact that Lexington, Nebraska, is not exactly downtown Chicago. Maloley trusted Roberts. Gottsch was some 300 miles away and the RJOB offices some 700 miles away. As a result, Maloley would not likely be excited to inquiry as easily and would be less sophisticated in his inquiry than an experienced investor with ready access to a number of reliable sources.

As for the subsequent conduct of the parties, we note that RJOB continued to allow Roberts to remain as an associate in its Lexington office. Jeffrey's husband continued to trade with Roberts and Jeffrey made no further warnings. In sum, when one considers all of the factors surrounding the fraud and Jeffrey's "warn-

---

**5.** Jeffrey testified:

Q. [D]id you ever tell Zickie Maloley that Spence Roberts was not registered with the CFTC?
A. I did.
Q. Do you recall about when you told him that?
A. Probably right after he started trading with Spence because I felt like I was losing some business to Spence, and I'm sure I probably was. So my argument was not to say that Spence is a dirty bird, don't trade with him; it was to say that he wasn't licensed, and you could get in trouble.
Transcript of hearing before the ALJ at 537–38.

**6.** Jeffrey testified:

Q. Ms. Jeffrey, did you ever receive telephone calls from Mr. Maloley during the day, during the business day in the Kearney office?
A. Sure.
Q. Would he ever call you from the Lexington office of R.J. O'Brien?
A. Yes.
Q. What would be the purpose of those calls?

A. To talk about what the market was doing, to place an order, to see what I was thinking, to see if I had any information that perhaps Spence [Roberts] didn't have.
Q. Did he ever call on—did he ever indicate that he was calling on behalf of Spence Roberts to get information about the market, get your opinion about the market?
A. No, not particularly, but Spence and I did share information back and forth to some extent.
Q. Was that ever done through Zickie?
A. I'm sure that indirectly it was; and well, I would—can I qualify this and say that my husband was trading with Spence also; so if there was information to give, it was to my benefit to make sure that Spence knew it so my husband knew it.
Q. So then the answer to my question as to whether information regarding the market sometimes was passed through Zickie either to your husband or to Spence Roberts would be that yes?
A. Yes.
Transcript of hearing before the ALJ at 544–45.

ing," we find that the CFTC erred in concluding that Maloley failed to exercise reasonable diligence in checking Roberts' registration.

Since the CFTC's disposition of Maloley's case on the statute of limitations grounds obviated the need for it to address the merits of Maloley's claim and defenses thereto, it is appropriate to remand this claim to the CFTC for further consideration consistent with this opinion. We note, however, that except as otherwise noted in its decision, the CFTC adopted the ALJ's findings of fact. Thus, to the extent the ALJ's findings are determinative of certain issues on remand, they need not be reconsidered.

### B. Fraudulent Assurances.

■ Applying the same standard of review to Maloley's claim for fraudulent assurances as we did to his claim for fraudulent inducement, we agree with the CFTC that, in the exercise of reasonable diligence, Maloley should have discovered the assurances that he would "be taken care of" were false well before May 5, 1979. Review of the record reveals that by September, 1979, Maloley had deposited some $105,000 into his account. This sum amounted to roughly one-third of his net worth.

As has been stated in the context of determining reasonable diligence in discovering a fraudulent assurances claim under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b):

> Even a wholly unsophisticated investor should have realized * * * when the market price had fallen to $17.50 rather than rising to $75—the existence of facts sufficient to precipitate into his consciousness a geographical paraphrase of the somewhat hackneyed remark of Marcellus to Horatio. The sharp fall in market price was not a concealed fact but, rather, was clearly and painfully revealed to the plaintiff. "At the very least, these circumstances should have aroused suspicion or curiosity on the part of plaintiff."

*Hupp v. Gray,* 500 F.2d 993, 996–97 (7th Cir.1974) (footnotes and citations omitted).

Thus, as to Maloley's claim for fraudulent assurances, we hold that in the exercise of reasonable diligence, he should have discovered the claim well in advance of the two-year period prior to the date he filed his complaint. Therefore, the claim is barred by the statute of limitations.

Accordingly, we reverse the decision of the CFTC in part and remand Maloley's remaining claim for further proceedings consistent with this opinion.

### JUDGMENT

On May 19, 1987, the Court entered its opinion affirming in part and reversing in part the Commission's order of April 21, 1986, in the reparations proceeding *Maloley v. R.J. O'Brien & Associates, Inc., et al.,* CFTC Docket No. R81– 752–82–112. Pursuant to Fed.R.App.P. 19, the Commission was directed to prepare and submit a proposed judgment. Upon consideration of the Commission's proposed judgment, together with the petitioner's objections thereto, it is ordered that judgment be entered as follows:

IT IS HEREBY ORDERED AND ADJUDGED by the Court that the Commission's order of April 21, 1986, is reversed insofar as it dismisses petitioner's claim of fraudulent inducement on the basis that it is barred by the two-year statute of limitations set forth in 7 U.S.C. § 18(a); and it is

FURTHER ORDERED AND ADJUDGED by the Court that the case is remanded to the Commission for consideration of the merits of petitioner's claim of fraudulent inducement, respondents' defenses thereto, and if the Commission finds for petitioner on his claim of fraudulent inducement, then the appropriate amount of damages; and it is

FURTHER ORDERED AND ADJUDGED by the Court that the Commission's order of April 21, 1986, is affirmed in all other respects.