Lloyd PINNEY, et al., Plaintiffs,

v.

EDWARD D. JONES & CO., INC. et al., Defendants.

Civ. No. 89–5004.

United States District Court,
W.D. Arkansas,
Fayetteville Division.

Aug. 15, 1989.

Kenneth R. Shemin, Jerry C. Jones, B. Michael Bennett, Rose Law Firm, Little Rock, Ark., Sidney P. Davis, Jr., William Jackson Butt, III, Davis, Cox & Wright, Fayetteville, Ark., Thomas A. Mars, Stanley, Harrington & Mars, Springdale, Ark., for plaintiffs.

Michael F. Coles, John Michael Clear, Leonard J. Asaro Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., Thomas B. Burke, John R. Eldridge, III, Burke & Eldridge, Fayetteville, Ark., Steve Shults, Shults, Ray & Kurrus, Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

This is an action under Sections 10(b) and 14(e) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78j(b) and 78n(e), and the rules and regulations promulgated thereunder. The named plaintiffs have brought this action on behalf of themselves and other purchasers of a 1982 offering by Edward D. Jones & Co. of 15% participating investment certificates (the "Certificates") due 1992 issued by Energy Management Corporation (EMC).[1] The action was commenced on January 13, 1989. The plaintiffs claim damages due to the defendants' alleged fraudulent conduct in connection with the sale of the securities and a subsequent exchange offer to holders of the certificates. The gravamen of plaintiffs' complaint is that the defendants failed to disclose material facts as to the risk factors of the investment and the financial condition of EMC.

In July, 1982, Edward D. Jones & Co. (Jones) underwrote and sold by means of a prospectus dated July 22, 1982, the certificates at issue. The certificates were issued by Energy Management Corporation. At the time of the offering, EMC was primarily involved in the exploration and development of oil and gas resources. The company's activities were conducted through limited partnerships for which EMC was a general partner.

The initial public offering price of the certificates was $15,000,000. Purchasers of the certificates were to receive interest at the rate of 15% per annum payable on the 30th day of March, June, September, and December, commencing September 30, 1982. In addition, purchasers were to receive participating interest based on a percentage of EMC's share of the net revenues derived from EMC sponsored limited partnerships.

Plaintiff, Lloyd Pinney, a resident of Indiana, purchased $50,000 of certificates on July 29, 1982. Plaintiff, James Crawley, a resident of Arkansas, purchased $20,000 of certificates on July 29, 1982. Plaintiffs received the quarterly interest payments until June 30, 1983. EMC was unable to pay the interest on this date and also issued a press release reporting a 2.9 million dollar net loss for the six months ended March 31, 1983. The trustee, Centerre Trust Company, was not notified of EMC's default in time to stop the mailing of the June 30 interest payments. Accordingly, the trustee stopped payment on the checks.

Subsequent interest payments were not made when due. EMC's net loss continued and in fact dramatically worsened. Concurrently with the default to the certificate holders, EMC was declared in default on approximately 25 million dollars in loans. EMC was successful in reaching an agreement to restructure the outstanding loans in December, 1983, and initiated an exchange offer in January, 1984. Despite the success of the exchange offer, EMC was unable to reverse the financial downtrend and was forced to seek protection under the bankruptcy code on February 14, 1986. A series of press releases and articles in the *Wall Street Journal* chronicled the financial woes of EMC.

This matter is now before the court on the defendants' motion for partial summary judgment, pursuant to Rule 56, Fed.R.

---

1. On August 4, 1989, this court entered an order adopting the proposed findings and recommendations of United States Magistrate, Beverly R. Stites regarding class certification. The class of non-participating investors represented by Lloyd Pinney was not certified.

Civ.P. Defendants contend all of the plaintiffs' claims that arise out of the 1982 offering of the certificates are barred by the applicable statute of limitations. The motion does not address plaintiffs' claims arising out of the exchange offer for the certificates undertaken by EMC in 1984.

■ Initially, defendants argue that plaintiffs' claims are barred by the three year statute of limitations set forth in the 1934 Securities Exchange Act for express causes of action. Defendants concede, however, that the 1934 Act does not specify a limitations period for actions under Section 10(b) and Rule 10b–5. Rather defendants urge this court to reconsider its holding in *Dingler v. T.J. Raney & Sons, Inc.,* 708 F.Supp. 1044 (W.D.Ark.1989), and adopt the reasoning of the Court of Appeals for the Third Circuit set forth in *In re Data Access Systems Securities Litigation,* 843 F.2d 1537 (3d Cir.1988) *(en banc)* *cert. denied,* —— U.S. ——, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988).

The Third Circuit in *Data Access,* relying heavily on *Agency Holding Corp. v. Malley-Duff & Assoc., Inc.,* 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987), adopted a uniform federal statute of limitations for Section 10(b) and Rule 10b–5 causes of action under the 1934 Act. *In re Data Access,* 843 F.2d at 1550. However, as this court previously noted, it is not free to choose the most logically appealing course of action; rather, the court must ascertain whether prior precedent exists and if it does, the court must apply it to the case before it. *Dingler,* 708 F.Supp. at 1055. *See also TCF Banking and Sav., F.A. v. Arthur Young & Co.,* 697 F.Supp. 362 (D.Minn.1988). In this circuit, *Vanderboom v. Sexton,* 422 F.2d 1233 (8th Cir. 1970) *cert. denied,* 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970) clearly held that the applicable statute of limitations was the forum state's blue sky statute. The blue sky statute in Arkansas now contains a five-year limitation period. Ark.Code Ann. § 23–42–106(f) (1987) previously codified as Ark.Stat.Ann. § 67–1256(e) (Repl.1980).

In the event the court refuses to reconsider its holding in *Dingler,* the defendants request the issue of the appropriate statute of limitations to be applied to an action under Rule 10b–5 be certified for appeal to the Eighth Circuit Court of Appeals pursuant to 28 U.S.C. § 1292(b). The court declines to do so. *See generally* Wright, Miller, Cooper, Gressman, *Federal Practice and Procedure: Jurisdiction* § 3929.

Alternatively, defendants argue plaintiffs are barred by the Arkansas Securities Act five year statute of limitations. Ark. Code Ann. § 23–42–106(f) (1987). It is the defendants' contention that inasmuch as plaintiffs filed this action on January 13, 1989, they are barred by the five-year statute of limitations if they discovered or should have discovered, upon reasonable inquiry, the fraud of which they now complain before January 13, 1984. In opposition, plaintiffs argue the defendants are precluded from raising the statute of limitations defense because the defendants concealed material facts. Specifically, plaintiffs allege their brokers, through actions and omissions, led the plaintiffs to believe from June 30, 1983, until January 20, 1984, that the investors would receive the benefit of their investment in EMC upon completion of the exchange offer.

Although the applicable limitations period is supplied by the forum state, "the applicable tolling rule is supplied by federal jurisprudence." *Morgan v. Dain Bosworth,* 545 F.Supp. 953, 955 (D.Colo.1982), *citing, State of Ohio v. Peterson, Lowry, Rall, et al,* 651 F.2d 687 (10th Cir.1981), *cert. denied,* 454 U.S. 895, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981). *See also Holmberg v. Armbrecht,* 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946); *Vanderboom v. Sexton,* 422 F.2d 1233, 1240 (8th Cir.1970); *Dekro v. Stern Bros. & Co.,* 540 F.Supp. 406, 414 (W.D.Mo.1982). "It is settled law that in cases involving fraud, the cause of action does not accrue and the statute of limitations does not begin to run until the fraud is discovered or, upon reasonably diligent inquiry, should have been discovered." *Maloley v. R.J. O'Brien & Associates, Inc.,* 819 F.2d 1435, 1439 (8th Cir.1987). "Discovery means 'either actual knowledge or notice of facts which, in the exercise of due

diligence would have led to actual knowledge of the violation.'" *Dekro*, 540 F.Supp. at 414 *quoting Osterneck v. E.T. Barwick Industries, Inc.*, 79 F.R.D. 47, 51 (N.D.Ga.1978) and *Azalea Meats, Inc. v. Muscat*, 386 F.2d 5, 8–9 (5th Cir.1967).

"The standard for what constitutes a reasonable inquiry is an objective one." *Maloley*, 819 F.2d at 1442. *See also Buder v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 644 F.2d 690, 692 (8th Cir.1981); *Koke v. Stifel, Nicolaus & Co., Inc.*, 620 F.2d 1340, 1343 (8th Cir.1980). "In determining whether a complainant exercised reasonable diligence in discovering a fraud, we must consider the nature of the misrepresentations and omissions, the opportunities to uncover them, and the subsequent conduct of the parties." *Maloley*, 819 F.2d at 1442 (*citing Hoffman v. Estabrook & Co., Inc.*, 587 F.2d 509, 518 (1st Cir.1978). The *Maloley* court in making this determination discussed the following factors: whether it was a form of misrepresentation ordinarily easily discovered; whether there were "warnings" which would reasonably lead to further inquiry in light of the circumstances surrounding the warning; the location of the claimant; and finally, the relationship between the claimant and his broker. *Maloley*, 819 F.2d at 1442–44. In essence, the court examines the totality of the circumstances.

Clearly, the totality of the information received by the plaintiffs is important. If the facts are such as to "excite inquiry," the "statutory period 'need not await [plaintiff's] leisurely discovery of the full details regarding [the] claim.'" *Buder v. Merrill, Lynch, Pierce, Fenner & Smith*, 644 F.2d 690, 693 (8th Cir.1981) (citations omitted). Indeed "[i]nvestors are not free to ignore warning signals which would cause a reasonable person to ask questions, but must 'exercise reasonable care and diligence in seeking to learn the facts which would disclose fraud.'" *Koke v. Stifel, Nicolaus & Co., Inc.*, 620 F.2d 1340, 1343 (8th Cir.1980) (citations omitted).

The requirement of due diligence is in essence an affirmative obligation imposed on the investor. It has been noted that a "potential plaintiff may not prolong the limitations period indefinitely simply by adopting an attitude of hear no evil, see no evil, speak no evil." *Dekro v. Stern Bros. & Co.*, 540 F.Supp. 406, 414 (W.D.Mo.1982).

■ Differing lines of authority exist as to the impact of fraudulent concealment upon the statute of limitations. *See Dekro*, 540 F.Supp. at 415 for a discussion of the various views. However, the better view analyzes the effect of the fraudulent concealment within the concept of due diligence, which determines when the cause of action accrues and the statute of limitations begins to run. As the court in *Osterneck* points out, the due diligence standard allows for consideration of any concealment. *Osterneck v. E.T. Barwick Industries, Inc.*, 79 F.R.D. 47, 52 (N.D.Ga.1978). "Rather than tolling the statute of limitations, defendants' conduct bears on the determination of when the plaintiff knew or should have known of the alleged fraud." *Id.* Thus, fraudulent concealment is, "simply one vital factor in answering when the fraud was, or could have been discovered." *Osterneck*, 79 F.R.D. at 53 *quoting Tobacco and Allied Stocks v. Transamerica Corp.*, 143 F.Supp. 323, 329 (D.Del.1956), *aff'd*, 244 F.2d 902 (3d Cir.1959). *See also Jensen v. Snellings*, 841 F.2d 600 (5th Cir. 1988); *Wehrman v. United States*, 830 F.2d 1480 (8th Cir.1987).

In the present case, defendants have pointed the court to an abundance of public information regarding EMC and its financial troubles during the relevant time frame (June 30, 1983 to January 13, 1984). The documents relied on include: EMC's press releases, *Wall Street Journal* articles; two communications between EMC and all certificate holders; a series of memos to Jones' representatives, including a July 22, 1983 memo from Jack Heisler, head of Jones' Investment Banking Department at the time; EMC's 10–Q's filed with the Securities and Exchange Commission; and EMC's quarterly report for the three months ended June 30, 1983, which was sent to all stock and certificate holders. Based on the volume of information available, it is the defendants' contention that

the plaintiffs discovered—or should have discovered—the risks associated with the investments prior to January 13, 1984. In opposition, plaintiffs argue summary judgment is inappropriate because there are material questions of fact. Plaintiffs contend the statute did not begin to run until January 20, 1984, because: 1) defendants fraudulently concealed its wrongdoing; and 2) defendants had a fiduciary relationship with plaintiffs.

■ The court has carefully reviewed the briefs of the parties and the voluminous documentation submitted therewith. Issues of due diligence and constructive knowledge must of necessity be determined on a case by case basis. When conflicting inferences can be drawn summary judgment is not appropriate. *Robertson v. Seidman & Seidman*, 609 F.2d 583, 591 (2d Cir.1979). Accordingly, the court will examine each of the named plaintiffs' claims separately.

Lloyd Pinney, a resident of Logansport, Indiana, worked as a truck driver for a frozen food wholesaler from 1950 until his retirement. Mr. Pinney had not completed high school. Mrs. Pinney was a school teacher for a number of years and had approximately two years of college education. Mr. Pinney was not an experienced investor, although he had previously invested in an annuity program.

Mr. Pinney first became acquainted with Dave Housworth, a Jones broker, in July, 1982. On July 8, 1982, the Pinneys opened a "passport" account with Jones and deposited $53,000. Shortly thereafter, on July 29, 1982, the Pinney's, on Housworth's recommendation, purchased $50,000 of certificates. The certificates were held in the "firm name." Housworth told the Pinneys that EMC was a "rather low risk investment." Although the Pinneys received a prospectus, they did not fully understand it. The Pinneys did not ask any questions concerning the prospectus; rather, the Pinneys relied totally on Housworth's representation. In fact, throughout their dealings with Housworth, the Pinneys trusted him to watch out for their interests.

The interest paid on the certificates was to be deposited directly into the Pinney's passport account. Any activity on the account was summarized in monthly account statements. However because the Pinneys did not understand the format of the statements, they did not realize the June 30, 1982, interest payment was not credited to their account. Nor did the Pinneys realize the subsequent interest payments were not made. The Pinneys relied on Jones and Housworth to put the interest in their account whenever it was due. Housworth communicated no other information concerning the EMC investments during 1983.

The Pinneys allege they were first aware of the trouble with EMC in February, 1984, when they returned from a vacation. At that time they learned of the exchange offer although it was too late for them to participate in it.

Gary Crawley is a Vietnam veteran who has held various construction jobs and is now employed by the Chevrolet dealership in Arkadelphia, Arkansas. The Crawley family had no investment experience. Crawley, his brother, and his mother invested $20,000 in the EMC certificates. The Crawleys first became acquainted with John Tackett, a Jones broker, in July, 1982, when the Crawleys decided to inquire about investing some insurance proceeds. Tackett presented the Jones program and the EMC certificates as being conservative and low risk. Tackett stated the EMC investment was a "safe investment with a good rate of return and relatively low or almost minimal, no risk of losing money in the company."

Crawley did not understand the prospectus but because he trusted Tackett and the reputation of the Jones firm, Crawley did not ask questions about the prospectus. The Crawleys were advised by means of a letter that the June 30 interest payment was not made. Crawley understood the letter to indicate that EMC was having cash flow problems, was undergoing reorganization, and would make the interest payment at a later date. Crawley stated the overall tone of the letter was reassuring. Crawley summarized the letter's mes-

sage thusly: "kind of a don't worry, be happy. We'll get you your money." Gary Crawley discussed his understanding of the letter with Tackett and was told his understanding was correct.

From July, 1983, to January, 1984, Gary Crawley stated several more reassuring letters were received. Each letter was discussed with Tackett who offered reassurances that there was nothing to worry about.

In the instant case the existence of the financial information mentioned previously is not disputed. The court declines to hold that the mere existence in the public domain of adverse financial information concerning EMC is sufficient to begin the running of the statute of limitations. To do so would impute to every investor constructive knowledge of all the information published in business periodicals or available to the public through securities filings.

The court concludes after reviewing the evidence before it that a question of material fact exists as to whether the Pinneys exercised due diligence. It is obvious from the Pinney's testimony that they relied heavily on the reputation of Jones and the representations their broker made at the time of the investment. The court cannot say as a matter of law that such reliance automatically negates a finding of due diligence.

The Pinneys, at the time of their investment in EMC, had little previous investment experience. In the circumstances, seeking the advice of a broker and relying on that advice is understandable.

The Pinneys did receive monthly account statements which would have revealed, if the Pinneys had examined them, that the quarterly interest payments for the last three quarters of 1983 were not paid. It is not clear, however, what other information, if any, was available to the Pinneys during 1983. The Pinney certificates were held in "street name" by Edward D. Jones & Company. Thus, any mailings to certificate holders would have been sent to Jones. Jones contends copies of the notices were sent to all persons who owned the certificates. The Pinneys could not remember receiving any such mailings.

The Pinney's broker communicated no information regarding EMC to the Pinneys during the relevant time frame. As a result, the Pinneys were not aware that their entire investment was at risk until February, 1984. Although the issue is a close one, the court holds that a question of material fact exists as to whether the exercise of due diligence required the Pinneys to do more to monitor their investment.

In regard to the Crawley certificates, Mr. Crawley was aware of the defaults and did make inquiries. Each inquiry was met with assurances by his broker that the crisis was temporary and that he and his family would ultimately receive the benefit of their investment. These assurances operated to lull the Crawleys into a false sense of security. Whether due diligence required the Crawleys to do more than make inquiries of their broker is a question of fact which precludes entry of summary judgment.

A separate order in accordance herewith will be concurrently entered.

## ORDER

On this 15th day of August, 1989, upon consideration of defendants' motion for summary judgment and the response thereto, the court finds for the reasons set forth in a memorandum opinion of even date, that the motion should be and hereby is denied.

IT IS SO ORDERED.